# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3692

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Missouri. |
| Robert Gerard Horn, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  May 14, 1999

Filed:  August 4, 1999

_____

Before LOKEN, HANSEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Robert Gerard Horn appeals from his conviction for possessing child pornography under 18 U.S.C. § 2252(a)(4)(B).  He maintains that the trial court incorrectly denied his motion to suppress evidence and that there was insufficient evidence to convict him.  He also argues  that the trial court erred in applying the sentencing guideline for trafficking in or distributing child pornography, *see* U.S.S.G. § 2G2.2, rather than the one for possessing child pornography, *see* § 2G2.4, and that he should not have received a five-level sentencing enhancement under § 2G2.2(b)(4). We affirm the judgment of the trial court.

The government's attention was drawn to Mr. Horn after Colorado police detective Walt Parsons, calling himself "Lew Kreeger" for the purposes of an investigation, placed an advertisement in which he posed as a collector who was "very discreet" and retained "youthful fantasies," qualities that he knew appeal to traffickers of child pornography. Mr. Horn responded with a letter expressing his interest in meeting or in trading video tapes "on all subjects from the tame to the taboo." (The detective explained at trial that "taboo" is a code word for child pornography.) In later letters, Detective Parsons repeatedly specified that he sought child pornography. Mr. Horn replied that he himself enjoyed pornography of every description and listed at least six different kinds, including "incest and family fun" and another type highly suggestive of child sex. He said that he had materials on all of these subjects and traded videos with those of similar interests. He offered to send videos to Detective Parsons, but noted that he preferred to ship "taboo" material by Federal Express to avoid contact with the federal government.

Mr. Horn eventually sent two video tapes of pornography that, on first viewing, did not appear to involve children. He wrote, "the tapes I sent have some decent material but I don't have all that much on that subject. most of it comes in small segments with other material but I will try to send [w]hat I have." Mr. Horn apparently had difficulty acquiring child pornography. He wrote that he had corresponded with a woman in Texas who told him that she had three children, all of whom were "very curious," and who said that she had "initiated" some boys and girls when she used to babysit, but that he had heard nothing from her recently and was uncertain what was happening.

Detective Parsons twice offered to send Mr. Horn tapes with child pornography. To the first invitation, Mr. Horn answered, "Thanks for checking but anything you can send or want to send is fine." There was no reply to Detective Parsons's second offer.

In a later communication, however, Mr. Horn reminded Detective Parsons that he was still waiting for tapes in exchange for the two that he had sent to Detective Parsons.

Meanwhile, Detective Parsons contacted Becky Powers, a postal inspector in St. Louis. Detective Parsons prepared a package for Mr. Horn containing a video entitled *Children's Sex Party* and Ms. Powers applied for a search warrant of the defendant's apartment conditioned upon the controlled delivery of the video. The affidavit listed six items to be seized, including the video and its packaging, all correspondence between Mr. Horn and Detective Parsons, and "[a]ny and all envelopes, letters, records, documents, correspondence, videotapes, published materials, and other objects relating to contact with an unidentified woman in Texas who has two daughters 7 and 12 years of age and a son 10 years of age." The ensuing search resulted in the seizure of hundreds of video tapes, a memo book, correspondence with other collectors, and two linked video cassette recorders, as well as the recently delivered *Children's Sex Party* video and its packaging. Investigators were of the view that eight of the videos seized included depictions of minors engaging in sexually explicit conduct.

## II.

Mr. Horn first contends that the search warrant was not based on probable cause and therefore that the videos taken from his house should not have been admitted into evidence. Probable cause means a "fair probability that contraband or evidence of a crime will be found in a particular place," given the circumstances set forth in the affidavit. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). We will uphold a judicial determination of probable cause so long as there was a " 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing." *Id.* at 236, quoting *Jones v. United States*, 362 U.S. 257, 271 (1960).

Mr. Horn maintains that there was no probable cause for including video tapes related to his correspondence with the Texas woman among the items to be seized in

the warrant. Mr. Horn contends, first, that the very nature of an anticipatory warrant, such as that obtained here, suggests that probable cause for a search does not exist until some further event takes place, from which he concludes that the Texas correspondence itself did not supply probable cause. Second, he maintains that even if his letters mentioning the Texas woman did contain evidence of criminal activity, this evidence was stale by the time that the warrant was issued because his final reference to her was made more than three months before the search. Finally, he argues that his letters never alluded to the existence of contraband material and that he told Detective Parsons that the correspondence with the Texas woman ended before it produced anything of interest.

Mr. Horn's first argument assumes that the government's affidavit did not contain factual allegations that independently supported a finding of probable cause to search his apartment for materials relating to his correspondence with the Texas woman. This contention is meritless. Mr. Horn's letters to Detective Parsons contained a good deal of evidence that this correspondence involved child pornography, enough, certainly, to establish probable cause for the issuance of a warrant. The conditional feature of the warrant was necessary only to allow sufficient facts to develop to allow the seizure of the video that Detective Parsons sent to Mr. Horn; it had nothing to do with those portions of the warrant dealing with the Texas woman. The video in question had little or no bearing on the question of whether the correspondence with the woman in Texas, and items related to that correspondence, contained evidence of the commission of a crime.

We turn, therefore, to Mr. Horn's second argument, namely, that the information provided in the affidavit about the Texas woman was stale. The last reference to the Texas woman appears in a letter written more than three months before the date of the warrant, and Mr. Horn maintains, therefore, that the letter did not constitute evidence that a crime was taking place at the time of the application for the warrant. "The source and credibility of evidence in support of a warrant request is considered in the totality

of the circumstances analysis, and a warrant is proper so long as the evidence as a whole creates a reasonable probability that the search will lead to the discovery of evidence." *United States v. Humphrey,* 140 F.3d 762, 764 (8th Cir. 1998).

We have held that there is no formula for determining when information has become stale. *United States v. Koelling*, 992 F.2d 817, 822 (8th Cir. 1993); *see also United States v. LaMorie*, 100 F.3d 547, 554 (8th Cir. 1996). The timeliness of the information supplied in an affidavit depends on the circumstances of the case, including the nature of the crime under investigation; the lapse of time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated. *Koelling*, 992 F.2d at 822-23; *see also LaMorie*, 100 F.3d at 554. We have further held that information four months old, or even three years old, may supply probable cause for a warrant to search the home of someone suspected of illegal possession of a firearm, because possession is a continuing offense and because firearm enthusiasts tend to keep their weapons for long periods of time. *United States v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995), *cert. denied*, 516 U.S. 903 (1995); *see also United States v. Rabe*, 848 F.2d 994, 995-97 (9th Cir. 1988) (child pornography mailed to defendant two years before detectives requested a search warrant may establish probable cause when supported by more recent correspondence describing defendant's collection).

In our case, Mr. Horn made it clear that he owned a wide range of pornographic videos and duplicating equipment and that he traded regularly with fellow enthusiasts, thus indicating a deep and continuing interest in his collection. Although Mr. Horn may well have destroyed the letters he received from Texas (since he instructed Detective Parsons to burn their own correspondence), there was a reasonable likelihood that he kept some record of his correspondence or even the correspondence itself. Furthermore, there was a fair probability that if he had received child pornography from the woman in Texas, it would still be in his possession even three or four months later.

We conclude, therefore, that the evidence regarding Mr. Horn's Texas correspondence was not so stale as to make the warrant defective.

Mr. Horn's final argument is that the correspondence with the woman in Texas never mentions the existence of any video tapes and thus that there was no justification for searching for such videos in the first place, whether or not probable cause existed to search for other forms of correspondence. Although Mr. Horn suggested to Detective Parsons that his contact in Texas had proved to be disappointing, there was nevertheless a reasonable likelihood that the correspondence did involve a video or videos of child pornography. It is clear that at one point Mr. Horn hoped that his contact in Texas would eventually provide him with pornographic material involving children. Although Mr. Horn's last reference to her was a remark that he had not heard from her for two weeks and therefore was "not sure whats up," a judge could reasonably conclude from the information set out in the affidavit that there was a fair probability either that the Texas woman had sent a video cassette after this last reference or that Mr. Horn possessed child pornography that he intended to trade for her material if it ever arrived. Probable cause does not require a " 'prima facie showing ... of criminal activity.' " *Gates*, 462 U.S. at 235, quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969). We therefore hold that there was probable cause to search for a video or videos relating to contact with the woman in Texas.

IV.

Mr. Horn next asserts that the warrant was defective in that it failed to meet the particularity requirements of the fourth amendment. (This argument comes as something of a surprise because, if anything, the warrant appears to be too narrowly drawn: If it had simply authorized the seizure of items depicting minors engaged in sexually explicit conduct, we would have been spared much of the discussion above.) He first complains that the warrant failed to state the crime of which he was suspected. The fourth amendment, however, requires only that the warrant "particularly describ[e] the place to be searched, and the persons or things to be seized"; neither the fourth

-6-

amendment nor our holdings require particularity with respect to the criminal activity suspected.

Mr. Horn further contends that the warrant failed to meet the particularity requirement in that the descriptions of some of the items to be seized were not sufficiently specific. In particular, he contends that the warrant used overly broad language when it authorized the search for and seizure of "[r]ecords, documents, receipts, keys, or other objects showing access to, and control of, the residence," and when it authorized the search for and seizure of "[a]ny and all envelopes, letters, records, documents, correspondence, videotapes, published materials, and other objects relating to contact with an unidentified woman in Texas who has two daughters 7 and 12 years of age and a son 10 years of age."

To satisfy the particularity requirement of the fourth amendment, the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized. *United States v. Strand*, 761 F.2d 449, 453 (8th Cir. 1985). The degree of specificity required will depend on the circumstances of the case and on the type of items involved. *Id.* A warrant naming only a generic class of items may suffice if the individual goods to be seized cannot be more precisely identified at the time that the warrant is issued. *United States v. Johnson*, 541 F.2d 1311, 1314 (8th Cir. 1976) (*per curiam*). We have upheld warrants authorizing the seizure of "certain books and records ... relating to the extortionate credit transaction business," *United States v. Dennis*, 625 F.2d 782, 792 (8th Cir. 1980), and of "any and all chemicals, ... books, records, chemical equipment, and personal papers relating to the manufacture and distribution of methamphetamine and the purchase of component chemicals and equipment which are contraband and fruits and instrumentalities of the commission of a crime which is in violation of [a certain statute, identified by section and subsections]." *United States v. Coppage*, 635 F.2d 683, 687 (8th Cir. 1980).

In Mr. Horn's case, the words "[r]ecords, documents, receipts, keys, or other objects showing access to, and control of, the residence" were sufficiently particular to preclude the exercise of any illegal discretion by the executing officers. The words "any and all ... correspondence, videotapes, published materials, and other objects relating to contact with an unidentified woman in Texas" were more general but still, we believe, sufficiently specific to satisfy the particularity requirement of the fourth amendment.

Mr. Horn argues that virtually anything in his apartment could conceivably relate to contact with an unidentified woman, including publications and portable objects of any kind. That may be true, but the argument is meritless, because it fails to focus on what the warrant authorizes. The officers were limited in their search by the fact that the objects seized had to be identifiably related to a woman in Texas with two girls and a boy, either by referring to the woman in some specific way, by depicting her and her children, or at the very least by bearing a Texas address together with a woman's name or in a woman's handwriting. We believe, therefore, that warrant was sufficiently definite to allow the officers to recognize and seize the materials described.

V.

Mr. Horn also contends that the searching officers went beyond the scope of the warrant, even as broad as it was, when they seized more than 300 video tapes for viewing elsewhere on the grounds that the tapes might contain evidence of Mr. Horn's control of his apartment or evidence of material related to contact with a woman in Texas. We agree with Mr. Horn that there was no reasonable probability that the video tapes related to Mr. Horn's access to his apartment. There was, however, probable cause to search for videos relating to the correspondence with the woman in Texas, as we explained above. The officers could not immediately identify which videos were most likely to fit the description of the items that they were authorized to seize, however, especially since Ms. Powers, who was present at the search, testified that individuals sometimes splice segments of child pornography into commercial tapes.

-8-

Since we think they could not practically view more than 300 videos at the search site, we hold that the officers did not exceed the scope of the warrant by seizing Mr. Horn's video collection in its entirety for examination elsewhere. *Cf. United States v. Kimbrough,* 69 F.3d 723, 728 (5th Cir. 1995), *cert. denied*, 517 U.S. 1157 (1996).

## VI.

Mr. Horn further maintains that the trial court erred in denying his motion for judgment of acquittal on the grounds of insufficient evidence. He concedes that five of the eight tapes seized depicted sexually explicit conduct but argues that the government produced insufficient evidence that the children on these tapes were minors or, in any case, that he knew that they were minors. Two of the remaining tapes obviously depicted children, but Mr. Horn contends that the government failed to establish that the children were engaged in sexually explicit conduct. (The jury did not find that possession of the eighth tape violated the statute.)

In regard to Mr. Horn's claim that five of the tapes involved adults rather than minors, we review the trial court's ruling on the motion for acquittal with considerable deference. Our task is to determine whether the evidence, viewed in the light most favorable to the government, is such that a reasonable juror *has* to have a reasonable doubt about the existence of at least one of the essential elements of the crime charged. *See United States v. Allery*, 139 F.3d 609, 611 (8th Cir. 1998), *cert. denied*, 118 S. Ct. 2389 (1998).

Having ourselves viewed the relevant portions of the five video tapes, we believe that a reasonable juror could conclude from seeing them that they depicted minors engaging in sexually explicit conduct and, therefore, that Mr. Horn knew that the videos did so. We note, moreover, that the court instructed the jury, without objection from Mr. Horn, that the *mens rea* element of the offense was satisfied if Mr. Horn knew, or "had reason to know," that the performers on the tapes were minors. We have no

doubt, after seeing the videos, that Mr. Horn had reason to know that they depicted performers less than 18 years old who were engaged in sexually explicit conduct.

We turn, therefore, to the remaining two tapes and the question of whether the images therein contained "sexually explicit conduct," which in the context of child pornography includes "lascivious exhibition of the genitals or pubic area of any person." *See* 18 U.S.C. § 2256(2)(E). The meaning of the phrase "lascivious exhibition of the genitals or pubic area" is a matter of law which we review *de novo*. *Cf. United States v. Amirault*, 173 F.3d 28, 32-33 (1st Cir. 1999), and *United States v. Knox*, 32 F.3d 733, 744 (3d Cir. 1994), *cert. denied*, 513 U.S. 1109 (1995). Nudity alone does not fit this description; there must be an "exhibition" of the genital area and this exhibition must be "lascivious."

In attempting to determine the limits of this category of sexually explicit conduct, we find helpful the six criteria suggested in *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986), *aff'd sub nom. United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987), *cert. denied*, 484 U.S. 856 (1987). *See also Amirault*, 173 F.3d at 31, and *United States v. Villard*, 885 F.2d 117, 122 (3rd Cir. 1989). In particular, we believe that when the child is nude or partially clothed, when the focus of the depiction is the child's genitals or pubic area, and when the image is intended to elicit a sexual response in the viewer, the depiction is lascivious. (The other criteria listed in *Dost*, 636 F. Supp. at 832, including a sexually suggestive setting, inappropriate attire or an unnatural pose for a child, and a suggestion of sexual coyness or willingness to engage in sexual behavior, are not relevant here. It goes without saying that the *Dost* criteria are neither definitive nor exhaustive.)

One of the two tapes in question shows children and adults on a topless beach and the other depicts nude children playing on a jungle gym; in both, the video tape freeze-frames images of young girls. Mr. Horn concedes that the girls depicted in the freeze-framed portions of the tapes were minors. After reviewing the two tapes in

-10-

question, we find that they do contain lascivious exhibitions of the genitals and pubic areas of minors. Shots of young girls are freeze-framed at moments when their pubic areas are most exposed, as, for instance, when they are doing cartwheels; and these areas are at the center of the image and form the focus of the depiction. In the beach scenes, the girls are wearing swimsuit bottoms, but a reasonable jury could conclude that the exhibition of the pubic area was lascivious despite this minimal clothing because of the way in which the pictures are framed. *Cf. Knox*, 32 F.3d at 750-51.

Mr. Horn argues that an otherwise innocent video tape of nude children cannot be made into a lascivious exhibition of the genitals by freeze-framing. We disagree. By focusing the viewer's attention on the pubic area, freeze-framing can create an image intended to elicit a sexual response in the viewer. The "lascivious exhibition" is not the work of the child, whose innocence is not in question, but of the producer or editor of the video. In this case, the producer or editor generated a product that meets the statutory definition of sexually explicit conduct.

## VII.

Mr. Horn also maintains that the trial court erred in its application of the sentencing guidelines. Mr. Horn was convicted of possessing child pornography, *see* 18 U.S.C. § 2252(a)(4)(B); ordinarily, then, his sentence would have been calculated under U.S.S.G. § 2G2.4, which carried a base offense level of 13 in 1995, *see* § 2G2.4(a), the year of the offense. *See* U.S.S.G. § 1B1.11(b)(1). That section, however, contains a cross-reference, *see* 2G2.4(c)(2), to § 2G2.2 and mandates the application of § 2G2.2 if the offense involved "trafficking in material involving the sexual exploitation of a minor (including receiving, transporting, shipping, advertising, or possessing material involving the sexual exploitation of a minor with intent to traffic)." The trial court therefore computed Mr. Horn's offense level under § 2G2.2, using the base offense level of 15 then in effect, *see* § 2G2.2(a), and adding the enhancements prescribed in § 2G2.2(b) for offenses involving a prepubescent minor, distribution of pornographic materials, portrayals of sadistic or masochistic conduct,

and a pattern of activity involving the sexual abuse or exploitation of a minor. The court thus arrived at a total offense level of 31.

Mr. Horn contends that the cross-reference to § 2G2.2 does not apply to his case because the trial court did not make a specific finding that he trafficked or intended to traffic in child pornography. *See* Fed. R. Crim. P. 32(c)(1). We have examined the record and Mr. Horn's argument is entirely without merit. If Mr. Horn's real complaint is that there was insufficient evidence that he trafficked or intended to traffic in child pornography, this objection is equally meritless. The relevant evidence included a memo book that contained information about tapes that Mr. Horn had sent to others and from which it appeared that some of these videos contained child pornography. The presentence report (PSR) also revealed that, on further inspection, the two tapes that Mr. Horn sent Detective Parsons turned out to contain some child pornography. Although neither the memo book nor the two tapes were admitted into evidence, Mr. Horn did not object to the portion of the PSR that recited their existence and contents.

At the sentencing hearing, Mr. Horn did suggest, rightly, that the burden was on the government to show that the tapes containing child pornography were among those traded, but he evidently dropped this line of reasoning later in the same hearing, when he conceded that he had traded the tapes in question and argued only that this did not amount to trafficking. Finally, Mr. Horn's letters to Detective Parsons contained passages describing his usual method for sending sexually explicit material involving minors. In short, the sentencing court had sufficient evidence from which it could conclude that Mr. Horn traded or exchanged child pornography.

The trial court, moreover, correctly held that § 2G2.2 and the cross-reference in § 2G2.4(c)(2) apply when the offense involved the exchange or barter of material depicting a minor in sexually explicit conduct, and not only, as Mr. Horn argues, when this material was offered for sale. For one thing, we believe that exchange or barter is

a form of "trafficking."  "Traffic," like "trade," includes both "the business of buying and selling for money" and "the business of exchanging commodities by barter," *May v. Sloan,* 101 U.S. 231, 237 (1879); *see also Webster's Third New International Dictionary* at 2422 (1986) ("traffic" is "the activity of exchanging commodities by bartering or buying and selling").  In addition, § 2G2.4 requires the application of § 2G2.2 in cases in which the defendant received, transported, or shipped child pornography, whether or not these acts amount to "trafficking" in such material.  *See United States v. Ellison*, 113 F.3d 77, 81-82 (7th Cir. 1997), *cert. denied*, 118 S. Ct. 235 (1997), and *United States v. Canada*, 110 F.3d 260, 264 (5th Cir. 1997) (*per curiam*), *cert. denied*, 118 S. Ct. 195 (1997).

## VIII.

Mr. Horn further argues that the trial court erred in applying the enhancement under § 2G2.2(b)(2) for distributing child pornography.  We understand this to be a repetition of his objection to the recommended enhancement in the PSR, in which he noted that application note 1 to § 2G2.2 states,  " 'Distribution,' as used in this guideline, includes any act related to distribution for pecuniary gain, including production, transportation, and possession with intent to distribute."  Mr. Horn argues that he did not possess pornographic materials for "pecuniary gain" but only for personal viewing.  Since he did not sell tapes for money, the issue is whether trading tapes in order to augment his personal collection constitutes "distribution."

We agree with those circuits that have given the word "distribution" in § 2G2.2(b)(2) its usual meaning in ordinary language and have read the application note to mean only that "distribution" includes, but is not limited to, transactions for pecuniary gain. *See United States v. Lorge*, 166 F.3d 516, 518-19 (2nd Cir. 1999), *cert. denied*, 119 S. Ct. 1372 (1999); *United States v. Hibbler*, 159 F.3d 233, 237-38 (6th Cir. 1998), *cert. denied*, 119 S. Ct. 1278 (1999); and *Canada*, 110 F.3d at 263-64. *See also* U.S.S.G. § 1B1.1, application note 2 ("[t]he term 'includes' is not exhaustive"). If Congress had intended § 2G2.2(b)(2) to apply only to distribution for pecuniary gain,

it could easily have said so directly. The purpose of the enhancement for distribution, we believe, is to increase the sentence of those defendants who did not merely receive child pornography but also disseminated it. Since Mr. Horn was found to have engaged in trade or barter, the trial court correctly imposed the enhancement for distribution.

## IX.

Mr. Horn argues that the trial court erred in applying an enhancement for engaging "in a pattern of activity involving the sexual exploitation or abuse of a minor," *see* § 2G2.2(b)(4). He contends that trafficking in child pornography does not qualify as sexual exploitation or abuse of minors, and we agree. In 1996, application note 1 to § 2G2.2 was amended to include a more precise definition of the term "sexual abuse or exploitation"; the application note now states quite explicitly that " '[s]exual abuse or exploitation' does not include trafficking in material relating to the sexual abuse or exploitation of a minor."

The Sentencing Commission stated at the time of the amendment that this revision was merely clarifying, and noted that the definition of "sexual abuse or exploitation" was consistent with recent case law holding that trafficking in child pornography was not sexual exploitation for the purposes of § 2G2.2(b)(4). *See United States v. Ketcham*, 80 F.3d 789, 794-95 (3rd Cir. 1996), and *United States v. Chapman*, 60 F.3d 894, 897-900 (1st Cir. 1995). Indeed, this appears to have been the unanimous interpretation of § 2G2.2(b)(4) in the federal appellate courts. *See United States v. Kemmish*, 120 F.3d 937, 941-42 (9th Cir. 1997), *cert. denied*, 118 S. Ct. 1087 (1998).

The government notes, however, that the amended version of application note 1 to § 2G2.2 defines "sexual abuse or exploitation" as "criminal sexual abuse of a minor, sexual exploitation of a minor, abusive sexual contact of a minor, ... [or] *any similar offense under state law*" (emphasis supplied), and argues that Mr. Horn's past and present trafficking in child pornography constitutes a pattern of activity involving such

a "similar offense." (Mr. Horn was convicted in state court in 1991 for possession of child pornography; that offense involved materials different from those at issue in our case.) The government's argument, however, ignores the clear statement in the application note that trafficking does not constitute sexual abuse or exploitation for the purposes of § 2G2.2. The trial court therefore erred when it imposed a five-level enhancement under § 2G2.2(b)(4) for a pattern of activity involving sexual abuse or exploitation of a minor.

Reducing Mr. Horn's offense level by five levels does not, however, affect his sentence. The trial court calculated his offense level to be 31, resulting in a sentencing range of 108-135 months; but since the maximum sentence for a violation of 18 U.S.C. § 2252(a)(4)(B) at the time of his offense was 60 months, the court sentenced him to that term. Without the five-level enhancement under § 2G2.2(b)(4), Mr. Horn's offense level is 26 and the corresponding sentencing range is 63-78 months. This still exceeds the statutorily authorized maximum sentence of 60 months. Mr. Horn's sentence therefore remains the same, and the trial court's error was harmless.

## X.

Finally, Mr. Horn contends that the trial court erred in denying his motion under Fed. R. Crim. P. 16(a)(1)(C). Mr. Horn contended below that he was entitled to have copies of the video tapes that were going to be used against him at trial so that any expert witness that he might procure could see and evaluate them. The trial court denied the motion, holding, *inter alia*, that the government's offer to allow Mr. Horn's expert to view the tapes would accomplish the same object that Mr. Horn sought; and, indeed, Mr. Horn does not show how he was prejudiced by the trial court's ruling. We note, too, that Fed. R. Crim. P. 16(d)(1) provides that "[u]pon a sufficient showing the court may at any time order that the discovery or inspection be denied, restricted, or deferred." We think that the restriction that the trial court imposed here, given the fact that the tapes were *prima facie* contraband, was authorized by the relevant rule.

On appeal, Mr. Horn identifies an entirely different reason for having wanted copies of the videos. He claims that if he had had copies, he could have sent them to the tapes' producers, who would have had information helpful to him relevant to the age of the performers. In a proper case, and perhaps after a sufficient preliminary showing, such a rationale might well have required the trial court to grant Mr. Horn's discovery motion. But Mr. Horn's difficulty here is that he never advanced this rationale to the trial court, and so he cannot now complain that the court denied his motion.

## XI.

For the reasons stated above, we affirm the judgment of the trial court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-16-